UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
SHAHIN MIAH,

               Plaintiff,

       - against -

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.
----------------------------------------------------------X

**MEMORANDUM AND ORDER**
14-CV-2718 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiff Shahin Miah, a retired New York City police officer, applied to the

Commissioner of Social Security ("Commissioner") for disability insurance benefits, claiming to

suffer from various knee complications.  The Commissioner denied his claim on the ground that

he was not disabled according to Social Security Administration ("SSA") regulations, a finding

that was affirmed by an Administrative Law Judge ("ALJ").  On May 1, 2014, Miah filed a

complaint alleging that his claim was improperly denied, after which Miah and the

Commissioner cross-moved for judgment on the pleadings.  Because the Court finds that the ALJ

improperly considered the medical evidence and failed to resolve a potential contradiction in the

record, the Court reverses the denial of disability benefits and remands this case for further

administrative consideration.

## BACKGROUND

I.   Factual Background

    A.  Non-Medical Evidence

Miah was born in 1976.  (*See* Admin. R. (Doc. No. 16) at 53.)  He completed two years

of college in 1996.  (*Id.* at 189.)  Miah then worked as a waiter until becoming a police cadet in

July 2002. (*Id.* at 53–54, 189.) Miah subsequently became a police officer and, after an injury, went on light duty in 2010. (*Id.* at 54, 58–59, 369.) At his hearing, Miah testified that his light duty work involved answered phones in the medical division until he stopped working on October 18, 2011 due to pain. (*Id.* at 59–60, 64.)

Miah testified that he recently moved in with his cousin to a third-floor walk-up. (*Id.* at 52, 63.) Miah stated that he spends his days at home and that his cousin does most of the housework and cooking. (*Id.* at 61–62.) He further stated that he makes his own breakfast and socializes with friends on the weekends. (*Id.* at 62–63, 70–71.) Miah testified that he leaves his house two or three times per day, and that he can walk two to three blocks before experiencing pain. (*Id.* at 63–64.) He first testified that he does not have difficulty sitting, but later remarked that he has pain after sitting for twenty or thirty minutes. (*Id.* at 63, 69.) Miah testified that there was no position in which he is pain-free and that his pain medication does not completely relieve his pain. (*Id.* at 70.)

B. Medical Evidence

i. Miah's Initial Knee Injury and Surgery

On July 18, 2009, Miah injured his left knee while pursuing a fleeing suspect at work. (*Id.* at 59, 63, 360–62, 365.) Shortly after, Miah went to the Roosevelt Hospital emergency room, complaining of knee pain and swelling. (*Id.* at 334.) There, he reported hitting his knee on a wall during the chase. (*Id.*) Examination of the knee revealed medial and lateral joint line tenderness, patellar tenderness, clicking, and contusion. (*Id.* at 335.) X-rays showed suprapatellar effusion, but no fracture or dislocation. (*Id.* at 338–39.) Miah was given Motrin and NSAIDs. (*Id.* at 333.) Upon discharge, he was advised that he could return to work. (*Id.* at 330, 337.)

On July 24, 2009, Miah underwent an MRI of his left knee. (*Id.* at 365.) The MRI revealed joint effusion; bone bruising; and at least a partial, and possibly a complete, tear of Miah's left anterior cruciate ligament ("ACL"). (*Id.*)

On August 17, 2009, Miah had an initial consult with Dr. Howard Levy, M.D., an orthopedic surgeon. (*Id.* at 284–85.) Miah complained of pain and instability in his left knee due to his torn ACL. (*Id.* at 284.) On examination, Dr. Levy found full range of motion, mild effusion, and tenderness in Miah's knee. (*Id.*) X-rays that day were normal, but Dr. Levy confirmed that MRI images showed effusion, chondromalacia, and a complete tear of the ACL associated with bone bruising. (*Id.*) Dr. Levy recommended surgery to repair the ACL, which would allow Miah to return to full duty as a police officer after six months. (*Id.* at 285.) Dr. Levy prescribed physical therapy before the surgery. (*Id.* at 377–79.) On October 1, 2009, Dr. Levy performed left knee ACL reconstruction on Miah. (*Id.* at 267–69.)

ii.  Miah's Second Knee Injury and Post-Operative Care

On October 9, 2009, at Miah's first postsurgical visit, he reported falling down a flight of stairs at home and banging his knee the previous night. (*Id.* at 282.) Dr. Levy observed that the ACL graft site was stable, and x-rays did not show any new fractures. (*Id.*) Dr. Levy recommended rest and prescribed Percocet. (*Id.*)

On October 14, 2009, Dr. Levy removed Miah's sutures and noted that there might be a fracture of the patella at the harvest site. (*Id.* at 281.) X-rays showed decreased swelling and confirmed a fracture at the harvest site on the patella. (*Id.* at 281, 303.) Dr. Levy recommended that Miah begin exercising his knee at home, but he deferred physical therapy. (*Id.* at 281.) On October 28, 2009, Miah returned to Dr. Levy, reporting decreased pain. (*Id.* at 280.) Miah began physical therapy the following day. (*Id.* at 355–56.)

On November 18, 2009, Miah returned to Dr. Levy. (*Id.* at 279.) Dr. Levy noted that Miah was improving, but had some difficulty walking. (*Id.*) X-rays showed no further displacement of the patella. (*Id.* at 279.) Dr. Levy ordered an ACL function brace to support and protect Miah's knee. (*Id.*) On December 21, 2009, Miah returned to Dr. Levy. (*Id.* at 278.) Dr. Levy noted that Miah had a good range of motion but that he was exhibiting quadriceps weakness. (*Id.*) Dr. Levy prescribed continuing physical therapy, three times per week, and recommended that Miah ride the stationary bike at the gym on alternate days. (*Id.*)

On January 20, 2010, Miah returned to Dr. Levy. (*Id.* at 277.) Miah reported that he had returned to work on light duty. (*Id.*) He stated that his range of motion and strength were improving, but that he still had significant pain around his patella that worsened with climbing stairs and standing for long periods. (*Id.*) On examination, there was mild effusion, significant weakness of the quadriceps, and tenderness at the inferior patellar pole. (*Id.*) Miah's ACL was stable and he could fully extend his knee. (*Id.*) Dr. Levy diagnosed post left knee ACL reconstruction with intact ACL graft, and patellofemoral syndrome that was hindering progress. (*Id.*) He recommended continuing physical therapy, icing the knee, Advil as needed, and using a knee sleeve for ambulation and stair climbing. (*Id.*) Dr. Levy also prescribed Percocet to take while at physical therapy. (*Id.*)

On February 22, 2010, Miah returned to Dr. Levy. (*Id.* at 276.) Dr. Levy noted that Miah had a full range of motion and that his ACL was stable. (*Id.*) Miah reported that he still had pain around his patella and quadriceps weakness. (*Id.*) Dr. Levy observed crepitus and patellar pole tenderness. (*Id.*) X-rays revealed good alignment of the patella and the ACL bone tunnels. (*Id.* at 276, 296.) Dr. Levy's diagnosis and treatment recommendation remained unchanged. (*Id.* at 276.)

On February 23, 2010, Murtain Haskin, M.D., City of New York Police Department ("NYPD") District Surgeon, completed a memorandum, detailing that Miah had been on restricted duty since February 22, 2010, and that he continued to experience chronic pain in his left knee. (*Id.* at 346.) Dr. Haskin stated that it was unlikely that Miah would be able to assume the full duties of a police officer and that his case should be referred for survey consideration. (*Id.*)

On April 19, 2010, Miah returned to Dr. Levy, reporting problems in his right knee. (*Id.* at 275.) Examination of the right knee revealed patellofemoral crepitus, pain at the infrapatellar tendon, but no joint line pain or instability. (*Id.*) Examination of the left knee revealed an intact ACL, no joint line pain, some quadriceps weakness, and patellofemoral crepitus. (*Id.*) X-rays of both knees did not reveal any obvious acute abnormalities. (*Id.*) Dr. Levy diagnosed intact ACL reconstruction and bilateral knee patellofemoral syndrome. (*Id.*) He recommended that Miah continue physical therapy, maintain a low impact exercise program, and stay on desk duty at work. (*Id.*)

On June 16, 2010, Miah returned to Dr. Levy, reporting significant knee pain that prevented him from building strength. (*Id.* at 274.) Examination showed tenderness in the infrapatellar tendon and quadriceps weakness. (*Id.*) Dr. Levy diagnosed left knee ACL reconstruction with residual pain and right knee patellofemoral syndrome. (*Id.*) He prescribed continuing physical therapy and ordered an MRI. (*Id.*) The MRI, completed the same day and reviewed on June 23, 2010, showed findings indicative of residual post-fracture deformity or incomplete fracture, possibly related to patellar tendon graft harvesting; soft tissue thickening, related to either mild degenerative fraying or evolving arthrofibrosis; and mild stress-related edema. (*Id.* at 273, 286–87.) The ACL graft was intact. (*Id.* at 287.) After reviewing the MRI,

Dr. Levy informed Miah that his persistent left knee pain was likely secondary to his postoperative fall and stress fracture in the patella, which was aligned and basically healed. (*Id.* at 273.) Dr. Levy recommended continuing conservative treatment with physical therapy, ice, anti-inflammatory medication, and a home exercise program. (*Id.*) Dr. Levy indicated that he expected the pain to resolve and that Miah should remain on light duty. (*Id.* at 273, 383.)

On August 18, 2010, Miah returned to Dr. Levy, reporting difficulty and pain when climbing stairs and running. (*Id.* at 272.) Examination revealed significant weakness in the quadriceps and tenderness along the medial and lateral patellar facets and the patellar tendon. (*Id.*) The ACL was stable. (*Id.*) Dr. Levy administered Dexamethasone and Lidocaine injections into Miah's left knee joint, and told him to continue physical therapy and a home exercise program for quadriceps strengthening. (*Id.*) Dr. Levy instructed Miah to stay home for a few days due to the injection and then resume his desk job. (*Id.*) He noted that Miah had patellofemoral syndrome in his right knee from compensating for his left knee, and he advised Miah to balance his gait pattern and use ice and anti-inflammatory medication. (*Id.*)

On September 22, 2010, Miah returned to Dr. Levy, complaining of "extreme" pain. (*Id.* at 271.) Dr. Levy recommended arthroscopy to shave down scar tissue and assess the articular cartilage. (*Id.*) He provided a note stating that Miah was able to return to work on desk duty only. (*Id.* at 391.)

On October 27, 2010, Miah returned to Dr. Levy. (*Id.* at 270.) On examination, Miah had full range of motion in his left knee and his ACL was stable. (*Id.*) There was patellofemoral crepitus, pain, and weakness of the quadriceps. (*Id.*) The right knee exhibited some tenderness. (*Id.*) Dr. Levy noted that the fracture Miah sustained shortly after surgery had significantly changed the course of his progress and would cause future knee problems. (*Id.*) He informed

Miah that he would not be able to return to full duty as a police officer due to the weakness, deficits, and pain in his left knee. (*Id.*) Again, Dr. Levy provided a note stating that Miah was able to return to work on desk duty only. (*Id.* at 380.)

On November 5, 2010, Miah sought a second opinion from Joseph Bosco, M.D., whom he had previously seen shortly after his initial knee injury. (*Id.* at 341.) Miah related his medical history, and Dr. Bosco told him that anterior knee pain, like that which he was experiencing, was common after ACL reconstruction, especially after using a bone-patellar autograft. (*Id.*) He stated that arthroscopy was occasionally helpful and that it "was very unlikely it would get better on its own." (*Id.*) Dr. Bosco declined to treat Miah and told him to return to the physician who did the initial surgery. (*Id.*)

On January 19, 2011, Miah returned to Dr. Levy. (*Id.* at 266.) Examination revealed left knee tenderness, quadriceps weakness, and crepitus. (*Id.*) Dr. Levy diagnosed left knee intact ACL reconstruction, left knee patellofemoral syndrome secondary to postoperative fracture significantly hindering progress and causing pain and weakness, and right knee patellofemoral syndrome. (*Id.*) He recommended that Miah continue with physical therapy and provided a note stating that Miah could return to work on desk duty only. (*Id.* at 266, 381.)

On April 4, 2011, Miah returned to Dr. Levy, reporting little improvement from physical therapy. (*Id.* at 265.) Dr. Levy prescribed continuing physical therapy. (*Id.* at 390.) Miah returned to Dr. Levy on June 22, July 18, August 1, and August 10, reporting similar complaints. (*Id.* at 261–64.) On June 22, Dr. Levy noted that it was his opinion that Miah should retire from the police force and go on permanent disability. (*Id.* at 264.) On July 18, August 1, and August 10, Dr. Levy administered Synvisc injections into Miah's left knee. (*Id.* at 261–63.)

On August 8, 2011, Miah was examined by the NYPD Medical Board. (*Id.* at 365–70.) The Medical Board concluded that there were significant orthopedic findings that precluded Miah from performing the full duties of a police officer, and recommended approval of accident disability retirement. (*Id.* at 370.) Miah remained employed at his NYPD desk job until October 18, 2011. (*Id.* at 63.) He alleges in the instant complaint that he has been disabled since October 12, 2011. (Compl. (Doc. No. 1) at ¶ 6.)

### iii. Medical Evidence After the Alleged Onset Date, October 12, 2011

On February 15, 2012, Miah returned to Dr. Levy for the first time since August 2011 when he received the Synvisc injections, which he reported had not provided much relief. (*Id.* at 375.) Miah reported that he had been doing home exercises and that his condition was unchanged. (*Id.*) He still had significant pain around his patella with associated quadriceps weakness. (*Id.*) Dr. Levy noted that Miah's ACL was stable. (*Id.*) He also noted that Miah had come for evaluation because he was applying for social security disability. (*Id.*) Dr. Levy recorded no examination findings. (*Id.*) He stated that Miah had chronic knee pain and was unable to perform any occupation due to persistent pain when sitting for long periods of time, standing for long periods of time, and climbing up and down stairs. (*Id.*)

On May 9, 2012, Miah returned to Dr. Levy, complaining about his ongoing knee pain. (*Id.* at 374.) However, Dr. Levy did not recommend any treatment and made no diagnostic findings except that Miah's ACL was stable. (*Id.*) On July 11, 2012, Dr. Levy completed and signed a Treating Doctor's Patient Functional Assesment To Do Sedentary Work form, indicating that Miah could stand or walk for less than two hours per eight-hour work day, sit for fewer than four hours, and lift and/or carry more than ten pounds for up to two-thirds of the day. (*Id.* at 372–73.)

iv. Miah's Consultative Examination

On March 16, 2012, Dr. Chaim Shtock, D.O., performed a consultative orthopedic examination on Miah. (*Id.* at 319–25.) Dr. Shtock reported that Miah could cook, clean, do laundry, and shop, "sometimes having help from his brother." (*Id.* at 319–20.) Dr. Shtock also reported that Miah watched television, went out, and socialized with friends. (*Id.* at 320.) Dr. Shtock's clinical diagnosis contained findings that Miah had "moderate limitation[s] with heavy lifting, squatting, kneeling, and crouching." (*Id.* at 321.) Additionally, Dr. Shtock found that Miah had moderate limitations walking long distances and standing or sitting for long periods. (*Id.*) Dr. Shtock found no limitation in overhead activities, frequent bending, or manual activities requiring use of Miah's hands, and found "no other physical functional deficits." (*Id.*)

II. Procedural Background

On December 30, 2011, Miah applied for Social Security disability insurance benefits, claiming that he had been disabled since October 12, 2011 with a torn left ACL and various knee complications sustained after falling down in his bathroom. (Compl. at ¶ 6; *see also* Admin. R. at 164.) The Commissioner denied his application on March 28, 2012. (Compl. at ¶ 7.) Miah then requested a hearing, which was held before ALJ Wallace Tannenbaum on August 24, 2012. (*Id.* at ¶ 9.) The ALJ found that Miah was not disabled and denied him benefits. (*Id.* at ¶ 10.) The ALJ's decision was finalized on March 5, 2014, when the Appeals Council declined Miah's request to review the matter. (*Id.* at ¶ 12.) Miah then requested review from this Court pursuant to 42 U.S.C. § 405(g), alleging that the ALJ's decision was not supported by substantial evidence and was contrary to law. (*Id.* at ¶ 13.)

# DISCUSSION

I. Standard of Review

    A. Review of a Denial of Social Security Benefits

In reviewing the final determination of the Commissioner, a court does not make an independent determination about whether a claimant is disabled. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Instead, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

B. <u>Eligibility for Disability Benefits</u>

To be eligible for disability insurance benefits, a claimant must show that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore, the claimant's "physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Under this framework, the SSA's regulations require a five-step analysis for determining whether a claimant is disabled:

(1) First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

(2) If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

(3) If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled.

(4) Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

(5) Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (alteration in original); *see* 20 C.F.R. §§ 404.1520, 416.920.  At the fourth step, in which the ALJ evaluates the claimant's residual

functional capacity ("RFC"), the ALJ must base his assessment "on all relevant medical and other evidence, such as physical abilities, mental abilities, and symptomology, including [subjective complaints of] pain and other limitations that could interfere with work activities on a regular and continuing basis." *Castillo v. Colvin*, No. 13-CV-5089 (AT) (MHD), 2015 WL 153412, at *11 (S.D.N.Y. Jan. 8, 2015) (citing 20 C.F.R. § 1545(a)(1)-(3)). The claimant bears the burden of proof in the first four steps of the inquiry, but the burden shifts to the Commissioner for the last step. *See Talavera*, 697 F.3d at 151.

II. Analysis

The parties do not dispute the ALJ's proper application of steps (1)–(3) of the five-part inquiry mentioned above. The Court therefore focuses on step (4) to determine whether the ALJ erred in determining Miah's RFC.

A. Treating Physician Rule

The Court first considers whether the ALJ's decision is "supported by 'substantial evidence.'" *Shaw*, 221 F.3d at 131 (quoting 42 U.S.C. § 405(g)). Notably, "[t]he law gives special evidentiary weight to the opinion of the treating physician." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Specifically, the "treating physician rule" provides that:

> Generally, [the SSA] give[s] more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). A treating physician's opinion on the "nature and severity" of the plaintiff's impairments is generally given "controlling weight," unless the opinion is either (1) not "well-supported by medically accepted clinical and laboratory diagnostic techniques . . . [or

(2)] inconsistent with the other substantial evidence in [the plaintiff's] case record." *Id.*; *see, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam).

If an ALJ declines to assign a treating physician's opinion controlling weight, "he must provide 'good reasons' for declining to do so, as well as 'good reasons' for according those opinions whatever weight he assigns to them."[1] *Castillo*, 2015 WL 153412, at *20 (quoting *Clark*, 143 F.3d at 118); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); *see Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("Failure to provide such good reasons for [declining to credit] the opinion of a claimant's treating physician is a ground for remand."). In doing so, the ALJ must consider:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA's] attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(c)(2)–(6)). "[W]here an ALJ does not appear to have taken into consideration the factors required by the treating physician rule, the Court cannot find that the ALJ's determination is supported by substantial evidence." *Sanchez v. Colvin*, No. 13-CV-929 (MKB), 2014 WL 4065091, at *12 (E.D.N.Y. Aug. 14, 2014).

---

[1] Moreover, if the ALJ finds that the treating physician's report is inadequate, he has a duty to re-contact the physician for clarification before he disregards it. *See* § 416.912(e); *see also Schaal*, 134 F.3d at 505. However, courts have held that this duty to re-contact is not absolute. *See Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."); *Micheli v. Astrue*, No. 10-CV-6655, 2011 WL 4074624, at *6 (W.D.N.Y. Sept. 13, 2011) (finding that ALJ did not err in failing to re-contact treating physician, despite an internal inconsistency in his opinion, where ALJ had sufficient evidence and a complete medical history to determine whether plaintiff was disabled and where he was not unclear as to the bases of the physician's findings), *aff'd* 501 F. App'x 26 (2d Cir. 2012).

Here, the ALJ's cursory discussion[2] of his reasons for discounting Dr. Levy's (treating physician) opinion in favor of Dr. Shtock's failed to properly consider the requisite factors.[3] This failure constitutes legal error sufficient for remand. *See, e.g.*, *Gallagher v. Astrue*, No. 10-CV-8338, 2012 WL 987505 (LTS)(AJP), at *20 (S.D.N.Y. Mar. 22, 2012) (finding remand appropriate where there was "no indication in [the ALJ's] opinion that he considered any of the other factors in determining what weight" to give the treating physician's report); *Hach v. Astrue*, No. 07-CV-2517, 2010 WL 1169926 (ENV), at *11 (E.D.N.Y. Mar. 23, 2010) (holding that remand was appropriate where the ALJ found the treating doctor's opinion "inconsistent" with the "objective evidence," but did not address the remaining factors that supported the doctor's opinion); *Schaal*, 134 F.3d at 504 (holding that the ALJ committed legal error by failing to consider all of the factors cited in the regulations); *Larsen v. Astrue*, No. 12-CV-414 (CBA), 2013 WL 3759781, at *2 (E.D.N.Y. July 15, 2013) (same).[4]

---

[2] In his decision, the ALJ wrote that:

> [I assigned] some weight to Dr. Levy's opinion but not controlling weight since his opinion is conclusory with little explanation, [his description of Miah's] functional limitations appear to be . . . sympathetic, . . . and the opinion is contradicted by the opinion of the consultative examiner whose opinion is given greater weight. . . . Dr. Levy's most recent [July 11, 2012 functional] assessment overstates the claimant's limitations. This level of severity is inconsistent with the objective medical evidence, the other opinion evidence, and even the claimant's own statements about his activity level. It is important to note that the majority of Dr. Levy's opinions were offered without supporting explanations or diagnostic testing results. . . . [On the other hand, Dr. Shtock's] opinion is given great weight because it is well supported by medically acceptable clinical and laboratory findings and is consistent with the record when viewed in its entirety.

(Admin. R. at 46.)

[3] While an ALJ is not required to expressly discuss and analyze each factor, *see Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013), the ALJ's limited discussion of the reasons for his decision does not suggest that he sufficiently considered the factors.

[4] Miah also argues that the ALJ failed to satisfy his duty to affirmatively develop the record by failing to re-contact Dr. Levy before disregarding his assessment as "conclusory with little explanation." (Pl. Reply Mem. in Supp. ("Pl. Reply") (Doc. No. 22) at 13.) Because the Court finds that the ALJ erred in failing to analyze all of the factors required to determine what weight to assign Dr. Levy's and Dr. Shtock's non-controlling opinions, the Court need not address whether the ALJ was obligated to re-contact Dr. Levy before disregarding his assessment.

1.  <u>The ALJ Failed to Consider the First and Fourth Factors</u>

The ALJ's opinion does not discuss the frequency, length, or nature of the relationship, or the extent of the treatment provided by Dr. Levy. "Generally, the longer a treating source has treated [the plaintiff] and the more times [the plaintiff] has been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). But the ALJ here did not mention, and appeared to give no weight to, the fact that Dr. Levy had treated Miah twenty-two times between August 2009 and February 2012. (*See* Admin. R. at 264–88, 377–78). During that time, Dr. Levy performed Miah's knee surgery, was responsible for all of his follow-up examinations, and, at the time of the ALJ's decision, was still treating Miah for pain management. (*See id.*) Still, the ALJ assigned Dr. Shtock's opinion more weight even though he only examined Miah once. (*See id.* at 322–25); *see also Selian*, 708 F.3d at 419 (noting that the Second Circuit has "cautioned that ALJs should not rely heavily upon the findings of consultative physicians after a single examination").

In failing to mention Dr. Levy's extensive and continuous relationship with Miah, the ALJ appeared to disregard that Dr. Levy was "in a unique position to make a complete and accurate diagnosis." *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Mongeur*, 722 F.2d at 1039 n.2); *see also Sanchez*, 2014 WL 4065091, at *12 (remanding where the ALJ assigned less weight to a treating physician than to a consultative examiner who had only performed one examination of the claimant).

Moreover, the ALJ appeared to ignore completely the fourth factor of the treating physician test, as he does not once mention the fact that Dr. Levy was a specialist in ACL surgeries like the one he performed on Miah. *See* 20 C.F.R. § 404.1527(c)(5).

## 2. The ALJ Failed to Consider the Second and Third Factors

The ALJ also failed to identify evidence in the record that supports and corroborates Dr. Levy's assessment. In determining whether a claimant has a disability, an ALJ is required to take into consideration all pertinent medical evidence available to him, and an ALJ's failure to do so or explain his rejection of the evidence is plain error. *See Kane v. Astrue*, 942 F. Supp. 2d 301, 305 (E.D.N.Y. 2013) (remanding where an ALJ discredited the reports of two treating physicians and failed to provide good reasons for not doing so). Here, the ALJ did not mention any of the objective medical evidence contained within the notes Dr. Levy compiled before the alleged onset date of October 12, 2011, which provide crucial context for Dr. Levy's findings after Miah's alleged onset date. *See Hilsdorf*, 724 F. Supp. 2d at 336 n.2 ("[T]o the extent that [evidence from an earlier time period], in combination with later evidence from the relevant time period, bears upon [p]laintiff's disability status during the relevant period, it must be considered."). As the ALJ's ultimate finding was that Dr. Levy's opinion was "inconsistent with the objective medical evidence," he erred by failing to first consider all of the objective medical evidence. (Admin. R. at 46.)[5]

To the extent that the ALJ believed Dr. Levy's diagnosis indicated a level of severity "inconsistent with the objective medical evidence, the other opinion evidence," and Miah's testimony regarding his daily activities, the ALJ's explanation was vague and insufficiently detailed. (*Id.*) The ALJ was required to explain specifically which evidence and statements he believed Dr. Levy's opinions conflicted with. *See, e.g.*, *Kane*, 942 F. Supp. 2d at 305

---

[5] Moreover, by rejecting Dr. Levy's opinion on the ground that it was "sympathetic" and overstated Miah's functional limitations, the ALJ improperly substituted his own judgment for medical opinions. Specifically, the ALJ inferred that "[a]n individual with the[] extreme limitations [that Dr. Levy describes] could hardly be expected to get out of bed, let alone perform the range of daily activities that the claimant has been shown to do on a consistent basis." (Admin. R. at 46). This too is a basis for remand. *See Burgess*, 537 F.3d at 131 (remanding where the ALJ improperly exercised his discretion to weigh the evidence by "substitut[ing] his own expertise or view of the medical proof for the treating physician's opinion").

("Although the ALJ need not resolve every conflict in a record, 'the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether [his] determination is supported by substantial evidence.'" (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)). The ALJ's failure to do so was legal error, for which remand is appropriate. *See Calzada v. Astrue*, 753 F. Supp. 2d 250, 270 (S.D.N.Y. 2010) ("[I]f the ALJ failed in his duty to fully develop the record . . . a reviewing court should reverse the Commissioner's decision and remand the appeal from the Commissioner's denial of benefits for further development of the evidence."); *see also Kane*, 942 F. Supp. 2d at 305 ("To fulfill this obligation, the ALJ must . . . adequately explain his reasoning in making the findings on which his ultimate decision rests." (internal quotation marks omitted)); *Hilsdorf*, 724 F. Supp. 2d at 350; *Hogue v. Barnhart*, No. 03-CV-4963 (SHS), 2005 WL 1036336, at *17 (S.D.N.Y. May 3, 2005).

B.  Credibility Determination

Miah also argues that the Commissioner improperly evaluated his testimony about his pain. When making a determination as to a claimant's RFC, "SSA regulations require the Commissioner . . . to consider all of a claimant's symptoms, including subjective complaints of pain." *Hilsdorf*, 724 F. Supp. 2d at 349 (citing 20 C.F.R. § 404.1529(a)). "[S]ymptoms, including pain, will be determined to diminish [a claimant's] capacity for basic work activities to the extent that . . . [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). Accordingly, the SSA regulations provide a two-step process for evaluating a claimant's subjective contentions of pain. *See id.* § 404.1529(c). First, the ALJ must determine whether the claimant has a medically determinable impairment that can reasonably be expected to produce the alleged pain. *See id.*

17

§ 404.1529(c)(1).  Second, if the claimant is found to have such an impairment, the ALJ must

evaluate the intensity and persistence of those symptoms, considering all of the available

evidence, including the claimant's own subjective complaints of pain.  *See id.*  If the claimant's

pain contentions are not substantiated by objective medical evidence, the ALJ must conduct a

credibility inquiry as to the claimant's contentions.  *See id.* § 404.1529(c)(3)(i)–(vii).

In conducting the credibility inquiry, the ALJ must consider the following factors: (1) the

claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3)

precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any

medications taken to alleviate the pain; (5) any treatment, other than medication, that the

claimant has received; (6) any other measures the claimant employs to relieve the pain or other

symptoms; and (7) any other factors concerning the claimant's functional limitations and

restrictions as a result of the pain.  *See Kane*, 942 F. Supp. 2d at 313 (citing 20 C.F.R. §

404.1529(c)(3)(i)–(vii)).  Ultimately, the "ALJ's credibility determination and decision to

discount a claimant's subjective complaints of pain are [only] entitled to great deference if [they

are] supported by substantial evidence."  *Colon v. Astrue*, No. 11-CV-3779 (KAM), 2011 WL

3511060, at *13 (E.D.N.Y. Aug. 20, 2011) (internal quotation marks omitted).

### 1.   The ALJ Failed to Take All Relevant Evidence into Consideration

First, the ALJ found Miah's contentions only "partially credible" because "[t]he alleged

level of limitation is not reconcilable with the objective medical evidence."  (Admin. R. at 45.)

However, the only objective medical evidence that the ALJ cited to support his conclusion was

the physical examination performed by Dr. Shtock.  The ALJ did not mention any of the

examinations performed by Dr. Levy.  Because the ALJ's decision insufficiently considered Dr.

Levy's medical opinions, his evaluation of Miah's subjective complaints of pain was not based

on all of the medical evidence, and remand is therefore appropriate for the ALJ to assess Miah's subjective complaints in light of a fully developed record. *See Colon*, 2011 WL 3511060, at *13 (finding that the ALJ's assessment of plaintiff's "credibility with respect to his symptoms of pain was . . . necessarily based on an incomplete record . . . [and therefore remanding] for the ALJ to assess plaintiff's complaints of pain in light of a fully developed record").

### 2. The ALJ Mischaracterized Miah's Functional Limitations

Second, the ALJ concluded that Miah's "allegations regarding his functional limitations and severity of pain" were inconsistent with his activity level, because "he is able to socialize with friends, despite his pain[,] . . . cook, clean, do laundry[,] . . . shop," shower, and dress himself. (Admin. R. at 45.) However, the ALJ failed to acknowledge Miah's limitations with respect to those functional abilities. At his administrative hearing, Miah noted that he feels pain after "walk[ing] a couple [of] block[s]," and although he socializes with his friends, he indicated that he does so only to the extent that they gather to sit and converse. (*Id.* at 66.) In fact, Miah revealed that he is unable to socialize with friends when they go to parties, because he feels pain if he "stand[s] [for a] long period of time." (*Id.*) In addition, the ALJ failed to acknowledge that, while Miah is able to "cook," he makes only his breakfast, and his cousin does most of the cooking and housework. (*Id.* at 65.) Moreover, though the ALJ pointed out that Miah "lives on the third floor . . . [without] an elevator," he failed to mention that Miah only leaves his apartment up to three times a day.[6]

---

[6] Although neither party raises the issue, the administrative record is unclear as to whether Miah leaves his apartment two or three times per day or per week. The ALJ first asked Miah how often he left his apartment per day, to which Miah responded two or three times; however, the ALJ's follow up question asked if it was fair to say that he left his apartment two or three times per week, to which Miah replied yes. (*See* Admin. R. at 66–67.) This reveals a contradiction in the record that the ALJ should clarify on remand. (*See id.*); *see, e.g., Torres v. Colvin*, No. 13-CV-730 (KBF), 2014 WL 406933, at *6 (S.D.N.Y. Feb. 3, 2014) ("Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is in order." (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1999)).

The administrative hearing transcript is devoid of evidence showing that Miah could engage in any of these activities without pain, and "there is nothing to suggest that [Miah] 'could engage in any of these activities for sustained periods comparable to those required to hold [even] a sedentary job.'" *See Hilsdorf*, 724 F. Supp. 2d at 352 (quoting *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)).  An individual can perform the things that Miah described in his testimony and "still experience debilitating pain [with] the intensity[,] persistence and . . . limiting effects []he claims." *Larsen*, 2013 WL 3759781, at *3.  In fact, upon questioning by his counsel at the hearing, Miah testified that there was no "position that he c[ould] be [in] where he [was] pain free" and that the pain medication he was taking did not "completely relieve [his] pain."  (Admin. R. at 73.)  The Second Circuit has repeatedly recognized that "[a] claimant need not be an invalid to be found disabled." *Colon*, 2011 WL 3511060, at *14 (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d. Cir. 1988)).  Rather, "[i]f a disabled person 'gamely chooses to endure pain in order to pursue important goals . . . it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working.'"[7] *Id.* (quoting *Balsamo*, 142 F.3d at 81–82).  The functional abilities listed above, taken together, do not "truly show[] that he is capable of working." *Id.*  Therefore, upon remand, the ALJ should consider the limitations on Miah's functional abilities and ascertain the true extent of those limitations.

### 3.  The ALJ Failed to Resolve a Contradiction in the Record

Third, the ALJ found that Miah made "inconsistent statements pertaining to his ability to sit, which "further diminish[ed] the credibility of his allegations."  (Admin. R. at 46.)  In his

---

[7] Even if the ALJ had considered Miah's actual performance of desk duty until October 2011 as evidence that Miah is truly capable of working, the ALJ failed to inquire further as to whether Miah was doing so under any degree of pain.  Notably, Dr. Levy's reports from July 2010 to October 2011 indicate that Miah was in an extreme amount of pain.  (*See* Admin. R. at 264–80.)

analysis of Miah's testimony, the ALJ acknowledged that Miah "has pain even while sitting[,] [that] [h]e can sit for about a half an hour before he starts having pain in his knee[,] . . . [and] there is no position that relieves his pain." (*Id.* at 45.) However, he then concluded that Miah's testimony at the administrative hearing was not credible because Miah first stated that he had no difficulty in sitting, but later stated that he felt pain after sitting for twenty to thirty minutes. (*Compare id.* at 66, *with id.* at 72.)[8] But these statements are easily reconcilable. It is certainly possible that Miah would feel no pain during the act of sitting down, but would feel pain after twenty minutes of continuous sitting.

Even if the statements were mutually exclusive, the ALJ had a duty to clarify the inconsistency to discern the true extent of Miah's pain. *See Colon*, 2011 WL 3511060, at *12 ("It is well-established that the ALJ has an affirmative obligation to develop the administrative record where gaps exist, particularly when 'further findings would help to assure the proper disposition of the claim.'" (quoting *Butts v. Barnhart*, 388 F.3d 277, 385 (2d Cir. 2004)); *see also Hankerson v. Harris*, 636 F.2d 893, 895–96 (2d Cir. 1980) ("[W]here the medical record contain[s] a number of references to plaintiff's subjective symptoms, it [i]s particularly important that the ALJ explore these symptoms with plaintiff so that the ALJ c[an] properly exercise his discretion to evaluate the credibility of the claimant . . . regarding the true extent of pain alleged." (internal quotation marks omitted)); *Hilsdorf*, 724 F. Supp. 2d at 352 ("Because the ALJ failed to question [p]laintiff at the hearing about the nature of his . . . limitations, he

---

[8] The relevant excerpts read:
> [ALJ]: And you have . . . any difficulty in sitting?
> [Miah]: No, sir.

(Admin. R. at 66.)
> [Counsel]: [Y]ou testified earlier that you have no problem when you're sitting. Do you have pain even . . . while you're . . . sitting?
> [Miah]: Yes, . . . if I sit [for] a long period of time, yes.
> [Counsel]: How long would you be sitting before you start having some . . . pain?
> [Miah]: Approximately a half an hour; 20 minutes.

(Admin. R. at 72.)

neglected his obligation to pursue opportunities to evaluate further plaintiff's subjective complaints." (internal quotation marks omitted)). The resolution of this potential inconsistency is especially crucial because it bears directly on the fifth step of the disability inquiry — whether Miah can do any other type of work.

If the ALJ had any misgivings about Miah's subjective symptoms and how they affected daily functioning, or even if he construed Miah's testimony to be inconsistent, the ALJ could easily have resolved any such uncertainties by further questioning Miah at the hearing. *See Colon*, 2011 WL 3511060, at *14 (citing *Hilsdorf*, 724 F. Supp. 2d at 352). "When an ALJ fails to sufficiently explore the facts underlying a claim, courts have not hesitated to remand." *Stemmerman*, 2014 WL 4161964, at *9 (collecting cases)); *see Hankerson*, 636 F.2d at 895–96 (remanding where the ALJ failed to question the plaintiff about various aspects of her testimony regarding subjective physical symptoms); *Hilsdorf*, 724 F. Supp. 2d at 353–56 (remanding and ordering the ALJ to explore the specific nature of plaintiff's subjective complaints and limitations during the relevant period). Accordingly, on remand, the ALJ should reconcile this inconsistency to the extent he relies upon it as a ground to discount Miah's credibility.

C. Remand and Attorney Fees

"Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.'" *Butts*, 388 F.3d at 385 (quoting 42 U.S.C. § 405(g)). Remand is "appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." *Kirkland v. Astrue*, No. 06-CV-4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting

*Butts*, 388 F.3d at 386).  Given the deficiencies outlined above, the decision is remanded for further proceedings consistent with this opinion.

Miah has requested attorney's fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, which provides that:

> A court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs . . . incurred by that party in . . . proceedings for judicial review of agency action, brought or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).  The statute further provides that an application for attorney's fees and costs must be submitted within thirty (30) days of final judgment in the action, and must comply with other explicit requirements.  *See id.* at § 2412(d)(1)(B).  Miah's request for such an award in his complaint does not so comply, and if Miah intends to make an appropriate application, he may do so within the time specified by the statute and in accordance within its other specifications.

**CONCLUSION**

For the reasons herein, defendant's motion for judgment on the pleadings is DENIED, plaintiff's motion for judgment on the pleadings is GRANTED, and the matter is REMANDED to the Commissioner of Social Security for further proceedings consistent with this opinion. Plaintiff's request for attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, is DENIED without prejudice.

The Clerk of Court is respectfully directed to enter judgment accordingly and close this case.

SO ORDERED.

Dated: Brooklyn, New York
      March 29, 2016

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge